**STEWART TITLE GUARANTY CO.**

v.

**John B. KIEFER, et al.**

**Civil Action No. 95–348.**

United States District Court,
E.D. Louisiana.

Oct. 8, 1997.

See also, 984 F.Supp. 984.

---

Malcolm A. Meyer, Monica Tufano Surprenant, Baldwin & Haspel, LLC, New Orleans, LA, for Security Title Guar. Corp. of Baltimore.

Steven W. Copley, Ernest Enrique Svenson, Martin E. Landrieu, Gordon, Arata, McCollam & Duplantis, LLP, New Orleans, LA, for John Parsons.

Walter C. Thompson, Jr., Thomas E. Schwab, Jan K. Frankowski, Barkley & Thompson, New Orleans, LA, for Scott Kiefer, Kiefer & Rudman PLC, Laurence D. Rudman, Harry L. Cahill, III, Terri Bankston Stirling and Gregory G. Faia.

Brian C. Bossier, Madison C. Moseley, Blue, Williams, LLP, Metairie, LA, Warren Stanley Edelman, Frederick A. Miller & Associates, New Orleans, LA, for Teresa Horgan.

Gary J. Rouse, Monroe & Lemann, New Orleans, LA, Mishthi Grace Ratnesar, Campbell, McCranie, Sistrunk, Anzelmo & Hardy, Metairie, LA, for Northfield Ins. Co.

Nancy J. Marshall, William Everard Wright, Jr., Karyn Joy Vigh, Deutsch, Kerrigan & Stiles, New Orleans, LA, for Homestead Ins. Co.

Daniel Anthony Rees, Christovich & Kearney, New Orleans, LA, for Home Ins. Co.

Max Nathan, Jr., Michael A. Berenson, Sessions & Fishman, Kurt Stephen Blankenship, Blue, Williams, LLP, Jan K. Frankowski, Barkley & Thompson, New Orleans, LA, for Anne H. Kiefer.

## ORDER AND REASONS

FALLON, District Judge.

Before the Court is a motion for summary judgment filed by defendant Northfield Insurance Company ("Northfield"). For the reasons that follow, the motion is DENIED.

**I. BACKGROUND:** Plaintiff in this action, Stewart Title Guaranty Company ("Stewart"), is a title insurer who, prior to January 1995, had in effect an agency agreement with Charter Title, Ltd. ("Charter"). Charter was authorized to execute title insurance commitments and title insurance on behalf of Stewart and other title insurers. In addition, Charter's closing attorneys provided virtually all services necessary to close real estate transactions, including title examinations and receipt and disbursement of sales proceeds, loan proceeds, and escrow funds. Under its agency agreements, Charter was required to keep in an escrow account all premiums and other closing funds belonging to third parties. On January 17, 1995, Charter filed a petition for bankruptcy protection. On that date, Charter's escrow accounts were revealed to be deficient by more than $1 million.

Stewart brings this action against various employees and attorneys of Charter, seeking, among other things, to recover premiums allegedly owed to it and funds expended by it to cover escrow shortages relating to transactions in which Stewart policies were issued. In addition, Stewart has asserted claims under the Louisiana Direct Action Statute [1] against various insurers, including Northfield, who allegedly have issued liability policies that cover Stewart's losses.

**II. ANALYSIS:** Summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56.

The Title Agent, Abstracter, Escrow Agent Errors and Omissions—Claims Made Policy No. CE00559 issued by Northfield to Charter (the "Northfield Policy") is a "claims made" policy affording coverage from May 6, 1994 to May 6, 1995 for "those sums that the insured becomes legally obligated to pay as damages because of a *negligent act, error or omission in the rendering of or failure to render professional services* as a title agent, abstracter, escrow agent and notary public." *See* Northfield's Exhibit A at § I(A)(1) (em-

phasis added). Northfield seeks summary judgment dismissing Stewart's claims against it on grounds that the causes of action asserted and damages sought by Stewart are excluded under the Northfield Policy as a matter of law.

Under Louisiana law, an insurance contract must "be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.Rev.Stat. Ann. § 22:654 (West 1995). In addition, an insurance policy "should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Louisiana Insurance Guaranty Ass'n v. Interstate Fire & Casualty Co.*, 630 So.2d 759, 763 (La.1994). It "should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Id.* The extent of coverage is determined by the "parties' intent as reflected by the words in the policy." *Id.* Words in the policy " 'are to be understood in their common and usual significance,' focusing on 'general and popular use.' " *Jensen v. Snellings*, 841 F.2d 600, 617 (5th Cir.1988) (quoting *Hebert v. First American Ins. Co.*, 461 So.2d 1141, 1143 (La.Ct. App. 5th Cir.1984)).

"Ambiguity in an insurance policy must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *Id.* "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ.Code Ann. art. 2049 (West 1987). "Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include." La. Civ.Code Ann. art. 2049 (West 1987).

Finally, "[i]f after applying the other general rules of construction an ambiguity

---

1. La.Rev.Stat. Ann. § 22:655 (West 1995).

remains, the ambiguous contractual provision is to be construed against the drafter." *Louisiana Insurance*, 630 So.2d at 764. This rule of "[s]trict construction against the insurer is especially appropriate when interpreting exclusionary clauses in insurance policies." *Jensen*, 841 F.2d at 615; *see also Huey T. Littleton Claims, Inc. v. Employers Reinsurance Corp.*, 933 F.2d 337, 340 (5th Cir.1991). Thus, "if an exclusion gives rise to multiple interpretations, 'the one affording coverage to the insured will be adopted.'" *Littleton, supra*, 933 F.2d at 340 (quoting *Stewart v. Louisiana Farm Bureau Mutual Ins. Co.*, 420 So.2d 1217 (La.Ct.App.1982)). Moreover, "'the insurer has the burden of proving the applicability of a coverage exclusion.'" *Farrell Lines, Inc. v. Insurance Co. of North America*, 789 F.2d 300, 306 (5th Cir.1986) (quoting *Hampton v. Lincoln Nat'l Life Ins. Co.*, 445 So.2d 110, 113 (La.Ct.App. 1984)). "Once coverage has been extended, ... it should be withdrawn only when exclusion is established with certainty." *Ogima v. Rodriguez*, 799 F.Supp. 626, 630 (M.D.La. 1992).

Stewart has asserted numerous causes of action against the various defendants, including: 1) default on a promissory note, 2) unjust enrichment, 3) injunctive relief, 4) negligent misrepresentation, 5) intentional misrepresentation, 6) conversion, and 7) violations of Louisiana's Unfair Trade Practices and Consumer Protection Law [2] In addition, this Court has previously ruled that Stewart's complaint encompasses a claim for general negligence in the rendering of professional services. *See, e.g.*, Stewart's Complaint at ¶¶ 25–27. Northfield argues that each of these claims is excluded from coverage under the policy pursuant to sections I(B)(3), I(B)(6), I(B)(12), I(B)(14), I(B)(15), and/or I(B)(16).

**A. *Section I(B)(3) and Section I(B)(14):*** In Count I of its complaint, Stewart alleges that Charter and J.B. Kiefer are in default on a $138,296.85 promissory note signed by Kiefer individually and as president of Charter on December 29, 1994. It is apparently uncontested that the promissory note represents premiums that Charter had theretofore failed to remit to Stewart. Northfield asserts three bases for its argument that its policy provides no coverage for any liability that Charter or J.B. Kiefer might have under Count I: 1) that any amounts due under the note do not come within the policy definition of a covered loss in § I(A)(1) of the policy; 2) that such amounts are excluded under § I(B)(3) of the policy; and 3) that such amounts are excluded under § I(B)(14) of the policy. The Court is unsatisfied that Northfield is entitled to judgment as a matter of law on any of these grounds.

■ Northfield's first argument is that, because the promissory note represents unpaid premiums, any amounts due under the note cannot be attributed to "a negligent act, error, or omission in the rendering of or failure to render professional services as a[n] ... escrow agent." This argument might prevail if the allegations of default set out in Count I (paragraphs 28, 29, and 30) were not aided by the allegations relative to all counts (set out in paragraphs 15 through 27). In particular, paragraph 17 asserts that all of the funds from closings were to be placed in Charter's escrow accounts, including those "earmarked for the payment of premiums owed to Stewart." The remaining general allegations assert that, although the funds were to be disbursed only for the purposes for which they were entrusted, they were used for other purposes, including Charter's operating accounts. *See* Complaint at ¶¶ 19—21. The Court has previously determined that the allegations of Stewart's complaint are sufficiently broad to encompass a cause of action for negligence against several of the individual defendants in the performance of their closing and clerical duties. Accordingly, the Court finds that Northfield has failed to establish as a matter of law that the amounts sought in Count I are not attributable to "a negligent act, error, or omission in the rendering of or failure to render professional services as a[n] ... escrow agent" so as to come within section I(A)(1).

■ Northfield's second argument fails for similar reasons. Section I(B)(3) of the policy provides that the insurance provided

---

2. La.Rev.Stat. Ann. § 51:1401–1419.

thereunder does not apply to "[a]ny damages for liability under any oral or written contract or agreement, except that this exclusion does not apply to liability for damages that the insured would have had in the absence of the contract or agreement." As stated above, the promissory note allegedly represents premiums owed to Stewart that Charter had failed to remit. Northfield argues that Count I falls within § I(b)(3) because the source of Charter's obligation to remit premiums was the Underwriting Agreement, entered into between Stewart and Charter.

Were it not for the *proviso* contained in § I(b)(3), Northfield's arguments might succeed. However, Northfield has failed to establish that the liability for unpaid premiums that Stewart seeks to impose against the various defendants in this case would not exist absent the Underwriting Agreement. The deposition testimonies of Scott Kiefer and John Parsons suggest that the premiums in question were actually paid by the purchaser at closing and placed in Charter's escrow account. Stewart argues that Charter and its employees and agents had a duty to disburse the escrow funds (including those earmarked as premiums due Stewart) in accordance with the purpose for which they were entrusted and that this duty existed independent of any contract. Certainly, if Stewart recovers damages representing unpaid premiums from any defendant other than J.B. Kiefer then such recovery must be based upon something other than contract— *i.e.*, conversion or negligence in the rendering of professional services as an escrow agent.[3] And, even with respect to Stewart's claims against J.B. Kiefer, the Court finds that Northfield has failed to establish that it is entitled to judgment as a matter of law on this issue.

Northfield likewise fails to carry its burden of proving the applicability of § I(B)(14), which excludes coverage for "[a]ny claim for fees, deposits or commissions owing, arising out of disputes over fees or charges for services or goods." Northfield argues that the premiums due Stewart represent the fee that it charges in exchange for its product—the title insurance policy. Perhaps this is so. However, even if the premium is a "fee," Northfield has failed to show that Count One arises out of any "disputes over fees." Thus, it has failed to establish that it is entitled to judgment as a matter of law based on § I(B)(14).

**B.** *Section I(B)(12):* In Count III of its complaint, Stewart alleges that it is entitled to injunctive relief to prevent the disposal or alienation of Kiefer's asserts. Northfield asserts that coverage of Count III is precluded under § I(b)(12) of the policy, which excludes coverage for "[a]ny damages arising out of any claims seeking relief or redress in any form other than money damages." *See* Northfield's Memorandum in Support of Summary Judgment, Exhibit A at p. 2.

Neither Stewart nor any of the alleged insureds offer any arguments in opposition to this position. However, the Court is not convinced that Count III comes within § I(B)(12). First, Stewart does not seek injunctive relief as a remedy for any of its alleged losses—even as an alternative to money damages. The only redress that Stewart seeks for its alleged losses is in the form of money damages. On its face, the entitlement to injunctive relief is alleged solely to protect against the alienation of assets out of which a money judgment might be satisfied, and it is difficult to conceive how any possible judgment that might be entered in this matter with respect to Stewart's claims could award damages "arising out of" the claim asserted in Count III. Thus, as a practical matter, it is unlikely that Northfield could ever be required to "pay" any "sums"

---

**3.** Northfield argues that it is entitled to summary judgment because Stewart has failed to submit any evidence to controvert Northfield's assertion that Stewart would have been entitled to no premiums in absence of the Underwriting Agreement. The Court disagrees. Stewart has offered the deposition testimonies of Scott Kiefer and John Parsons. And, more importantly, considering that it is Northfield who bears the burden of proving that § I(B)(3) applies, *Farrell Lines, Inc. v. Insurance Co. of North America,* 789 F.2d 300, 306 (5th Cir.1986), the Court finds that Northfield has failed to carry its initial burden of demonstrating the absence of a genuine issue as to this fact.

with respect to Count III.[4] Accordingly, the Court finds that Northfield has failed to establish I(B)(12), any of Stewart's claims are excluded pursuant to § I(B)(12).

**C. *Section I(B)(6), Section I(B)(15), and Section I(B)(16):*** With respect to the remainder of the claims asserted in Stewart's complaint (unjust enrichment, negligent misrepresentation, intentional misrepresentation, conversion, Unfair Trade Practices, and general negligence), Northfield asserts that such claims are each excluded under sections. I(B)(6), I(B)(15), and/or I(B)(16) of the policy.

Section I(B)(6) excludes coverage for "[a]ny damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission by or on behalf of or at the direction of (1) the insured or (2) any employee regardless of whether or not qualifying as an insured." *See* Northfield's Memorandum in Support of Summary Judgment, Exhibit A at p. 2. Section I(B)(15) excludes coverage for "[a]ny damages arising out of any gain, profit or advantage to which the insured is not legally entitled." *See* Northfield's Memorandum in Support of Summary Judgment, Exhibit A at p. 2. Section I(B)(16) excludes coverage for "[a]ny damages arising out of the commingling, conversion, misappropriation or defalcation of funds or other property." *See* Northfield's Memorandum in Support of Summary Judgment, Exhibit A at p. 2.

Northfield argues that all of Stewart's claims are excluded because, regardless of the cause of action asserted, each arises out of the same alleged activity—namely, that J.B. Kiefer used or allowed others to use the funds in Charter's escrow accounts as part of Charter's operating accounts or, in the very least, for some unauthorized purpose. *See* Stewart's Complaint at ¶¶ 20, 21. Essentially, Northfield's argument is that if the escrow funds were improperly disbursed intentionally, then all of Stewart's claims are barred from coverage under § I(B)(6) as arising out of an intentional or dishonest act or under § I(B)(16) as arising out of the conversion of funds. If the funds were negligently misapplied and the error was in favor of the insured, then Stewart's claims are

precluded under § I(B)(15) as arising from a gain to which the insured was not legally entitled or under § I(B)(16) as arising out of the commingling of funds. If the funds were negligently disbursed to an improper third person, then Stewart's claims are excluded from coverage under § I(B)(16) as arising out of the "defalcation" of funds, which term Northfield, citing Black's Law Dictionary, defines so broadly as to include any failure to properly account for trust funds or money held in any fiduciary capacity, whether negligent or intentional.

Although acknowledging that the Northfield Policy is not a fidelity bond and does not provide coverage for intentional or dishonest acts, Stewart urges that Northfield's interpretation of the exclusions in I(B)(6), I(B)(15), and I(B)(16) be rejected because it would exclude coverage for any conceivable "negligent act, error or omission" that an escrow agent might commit "in the rendering or failure to render professional services." J.B. Kiefer and Anne Kiefer join Stewart in this argument and argue that even if coverage is excluded with respect to certain of Stewart's allegations, it is not excluded as to those relating to negligent misrepresentation. Defendants Laurence Rudman, Scott Kiefer, and Kiefer & Rudman, PLC, take this argument one step further, asserting that even if coverage is excluded with respect to claims against other defendants it is not excluded as to the claims against them because of the "Separation of Insureds" clause at § VII(G).

■ **1. *Section I(B)(15):*** With respect to the exclusions contained in §§ I(B)(15) and I(B)(16), the Court agrees with Stewart that they cannot be read with the meaning that Northfield would give them. As set out above, § I(B)(15) excludes coverage for "[a]ny damages arising out of any gain, profit or advantage to which the insured is not legally entitled." Given Northfield's sweeping interpretation, § I(B)(15) could exclude virtually any claim made against an insured. Stewart argues that this provision is intended to exclude damages to make the insured whole resulting from the insured's loss of

---

4. Northfield Policy at § I(A)(1).

gain to which it was never entitled. Compared with Northfield's interpretation, the Court finds this interpretation equally reasonable. Thus, summary judgment cannot rest upon § I(B)(15).

**2. Section I(B)(16):** ▮ Nor can § I(B)(16) serve as the underpinning for a Rule 56 dismissal. As explained earlier, § I(B)(16) excludes coverage for "[a]ny damages arising out of the commingling, conversion, misappropriation or defalcation of funds or other property." Given the construction advocated by Northfield, the terms "defalcation" and "commingling" would include any negligent failure to properly account for trust funds or money held in any fiduciary capacity, thereby obliterating coverage under the policy for any negligent error or omission that could possibly occur in the rendering of professional services as an escrow agent. Thus, when I(B)(16) is read in light of § I(A)(1) (which expressly extends coverage for negligent errors and omissions in the rendering of professional services as an escrow agent), it is clear that Northfield's catch-all definition cannot have been what the parties intended—especially considering that other definitions of the terms exist that can be read in harmony with § I(A)(1).[5]

**3. Section I(B)(6):** ▮ As stated above, section I(B)(6) excludes coverage for "[a]ny damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission by or on behalf of or at the direction of (1) the insured or (2) any employee regardless of whether or not qualifying as an insured." Stewart does not deny that its allegations of conversion, commingling (use of escrow funds as part of Charter's operating accounts), and intentional misrep-

resentation are excluded under § I(B)(6). Rather, Stewart points out that, in addition to these claims, it has asserted a negligent misrepresentation claim against J.B. Kiefer and Teresa Horgan, a general negligence claim against Horgan, and a claim against Scott Kiefer and Laurence Rudman for negligent rendering of professional services as an escrow agent. Stewart argues that genuine issues of fact remain as to state of mind and use of the missing escrow funds, thus precluding a determination that any award to Stewart in this matter would necessarily "aris[e] out of" commingling, misappropriation, conversion or an employee's intentional or dishonest act. As in *Jensen v. Snellings,* Stewart argues, "many of the misdeeds complained of could have negligently occurred, without the wrongful, fraudulent intent alleged in the complaint." *Jensen,* 841 F.2d at 615.

▮ Stewart is correct that, under Louisiana law, "when an insured's liability arises from two sources, an exclusion pertaining to one source does not preclude coverage based on the other." *Farrell Lines, Inc. v. Insurance Co. of North America,* 789 F.2d 300, 306 (5th Cir.1986) (citing *Terra Resources, Inc. v. Lake Charles Dredging & Towing, Inc.,* 695 F.2d 828, 831 (5th Cir.1983)). For this rule to apply, the two theories of liability must be "completely independent"—*i.e.,* "the insured would still be liable even if the facts ... were revised so as render the [dishonesty/fraud/intentional act] exclusion inapposite." *Huey T. Littleton Claims, Inc. v. Employers Reinsurance Corp.,* 933 F.2d 337, 341 (5th Cir.1991).[6]

Northfield argues that Stewart's negligence claims are not "completely independent" from its claims based upon conversion,

---

**5.** For example, "defalcation" is defined by the Oxford Dictionary as a "misappropriation of money." *The Oxford Dictionary and Thesaurus* 366 (Am. ed.1996). "Misappropriate," in turn, is defined as "apply[ing] (usu. another's money) to one's own use, or to a wrong use" and as being synonymous with "embezzle, steal, filch." *Id.* at 953. Although "commingle" is defined simply as to "mingle together," when read in light of § I(A)(1) and its juxtaposition with the terms "conversion" and "misappropriation," the term is not sufficiently unequivocal to withdraw coverage for the negligent mixing of funds. *Id.* at 279.

**6.** *See also Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co. of Pittsburgh,* 99 F.3d 695, 704–05 (5th Cir.1996) (applying identical Texas rule in case of sexual abuse by teacher to exclude coverage for separate negligent supervision claims against defendants other than the abuser: "where a claim against an insured would not exist 'but for' conduct explicitly excluded by the policy, the *dependent* claims are also not covered under the policy, regardless of whether the insured against whom the derivative claims are directed actually engaged in the excluded acts") (emphasis added).

intentional misrepresentation, and other intentional conduct—that the claims for negligence would not exist but for the conversion and/ or intentional commingling and misappropriation of escrow finds. Therefore, Northfield posits, no genuine issues of material fact remain as to the excludability of Stewart's claims pursuant to § I(B)(6). In support of this position, Northfield proffers the deposition testimony of Teresa Horgan, which states that funds were taken from a certain escrow account (account # 9803) and placed with monies used for the operations of Charter Title. *See* Northfield's Supplemental Memorandum, Exhibit B. She also testifies that at the time of these transfers, she knew that she was taking money belonging to others and putting them into operating accounts for uses inconsistent with the purpose for which they were received. *Id.*

Certainly, the Horgan deposition supports the reasonable inference that the mismanagement of the Charter escrow accounts was intentional on the part of certain insureds and/or employees. However, the Court must agree with Stewart that the Horgan deposition fails to conclusively establish that the negligent conduct alleged by Stewart was not also a cause of Stewart's losses, "completely independent" of the intentional conduct. More importantly, however, even if § I(B)(6) read alone would exclude coverage for all of Stewart's claims, it would not secure a summary dismissal, for § I(B)(6) must be read in light of § VII(G).

4. *Section VII(G):* Stewart and the Kiefer & Rudman defendants argue that § I(B)(6) must be read in conjunction with the "Separation of Insureds" provision at § VII(G). This provision reads:

G. SEPARATION OF INSUREDS

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this Insurance applies:

1. As if each named Insured were the only Named Insured; and

2. Separately to each Insured against whom "claim" is made or "suit" is brought.

According to Stewart and the Kiefer & Rudman defendants, § VII(G) requires that the intentional acts exclusion be applied separately as to each insured against whom a claim has been asserted. Stated another way, "when the claim of any insured is considered, all other insureds must be disregarded and not treated as insureds for the purpose of that claim." *Shapiro v. American Home Assurance Co.,* 616 F.Supp. 900, 903 (D.Mass.1984). "If the insured making the particular claim of coverage [committed an "intentional, dishonest, fraudulent, criminal or malicious act, error or omission"], then the exclusion applies and coverage for that insured is defeated." *Id.* at 904. However, "if only some other insured [committed the intentional, dishonest, or fraudulent act], the exclusion and severability clauses taken together plainly say the insured who is not guilty of the [excluded intentional conduct] is covered." *Id.* Thus, even if coverage is excluded pursuant to § I(B)(6) with respect to Stewart's claims against certain insureds, it is not excluded as to innocent co-insureds.

■■■ Northfield argues that the Separation of Insureds provision should not be read as modifying § I(B)(6) because of the exclusion's use of the term "any employee." The Court disagrees. The jurisprudence is clear that the effect of a "separation of insureds" provision upon a given exclusion turns upon the precise terms used in that particular exclusion. *See e.g. Carbone, Inc. v. General Accident Ins. Co.,* 937 F.Supp. 413, 420 (E.D.Pa.1996) (construing a "separation of insureds" provision nearly identical to that contained in the Northfield Policy). Where the exclusion clause uses the term "any insured," application of the "separation of insureds" provision will not yield a different result. *Id.; see also Oaks v. Dupuy,* 653 So.2d 165, 168–69 (La.Ct.App.2d Cir.), *writ. denied,* 655 So.2d 335 (La.1995). However, where, as here, the exclusion at issue uses the term "the insured," the claims against an insured will not be barred from coverage "solely on the basis of the [excludable] acts of other insureds." *Shapiro,* 616 F.Supp. at 903. That § I(B)(6) also uses the term "any employee regardless of whether or not qualifying as an insured" does not dictate a different result. The term "any employee" follows the term "the insured." Although the relationship between these two terms is not ex-

plained, the term "any employee" cannot be read, as Northfield suggests, as meaning any employee of "any insured." This would require rewriting the policy and is clearly contrary to the parties' intent as manifested by use of the term "the insured" in light of § VII(G).[7] In light of the jurisprudence on this issue, "any employee" must refer to "any employee" of "the insured"—namely, the insured claiming coverage for the particular claim at issue. Thus, even if Northfield had demonstrated for purposes of Rule 56 the lack of genuine issue with respect to those claims asserted against Horgan, it would nevertheless fail to carry its Rule 56 burden with respect to Stewart's claims against the other defendants.

Accordingly, the Court finds that genuine issues of material fact exist which preclude determination as a matter of law that coverage is excluded under the Northfield Policy with respect to the claims asserted by Stewart in this matter.

Therefore, for the foregoing reasons, IT IS ORDERED that Northfield's motion for summary judgment is HEREBY DENIED.

---

7. *See Carbone,* 937 F.Supp. at 419 (the rationale behind the separation of insureds clause was to "clarify[] 'what insurance companies had intended all along, namely that the term 'the insured' in an exclusion refers merely to the insured claiming coverage" (quoting *Alaska Dep't of Transp. & Pub. Facilities v. Houston Cas. Co.,* 797 P.2d 1200, 1205 (AK.1990))).